# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 18-1157V

```
* * * * * * * * * * * * * * * * * * * * * * * *
                                    *
YOVANNY ALONZO,                     *        Filed:  August 14, 2023
                                    *
            Petitioner,             *
                                    *
       v.                           *
                                    *
SECRETARY OF HEALTH AND             *
HUMAN SERVICES                      *
                                    *
            Respondent.             *
                                    *
* * * * * * * * * * * * * * * * * * * * * * * *
```

*Robert J. Krakow,* Law Office of Robert J. Krakow, P.C., New York, NY, for Petitioner.

*Lynn C. Schlie,* U.S. Dep't of Justice, Washington, D.C., for Respondent.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING DAMAGES

This matter was initiated on August 9, 2018. Petitioner alleged that he experienced Guillain-Barré syndrome ("GBS") after receipt of an influenza ("flu") vaccine in 2016. Petition, dated August 9, 2018 (ECF No. 1). The case was initially assigned to the "Special Processing Unit" ("SPU"), since it was assumed the matter might settle easily—and indeed an entitlement ruling (ECF No. 65) was entered in 2020 in Petitioner's favor after Respondent's concession. Respondent's Report, dated May 1, 2020 (ECF No. 64). Thereafter, a damages order was issued on May 5, 2020, in the expectation that the parties could reasonably identify Petitioner's damages and agree to at least some common award components. Damages Order, dated May 5, 2020 (ECF No. 66) ("Damages Order").

In the ensuing three-plus years, however, the parties have been wholly unable to agree to a *single* category of damages—resulting in the claim's transfer out of SPU. I subsequently established a briefing schedule affording the parties the opportunity to argue for the damages they maintain are appropriate, with the hope that perhaps in so doing they might reach agreement on the easier categories. They have now filed their respective briefs (Petitioner's Brief, dated December 16, 2022 (ECF No. 103) ("Br."); Respondent's Brief, dated January 20, 2023 (ECF No. 105) ("Opp."))—and still, damages remain utterly unresolved.

For the reasons set forth below, I find that the record is sufficient to decide two damages components based solely on written submissions and the existing record: (i) pain and suffering, and (ii) lost earnings. For the reasons stated below, Petitioner shall receive $170,000.00 in actual pain and suffering, with no future component. Petitioner has not preponderantly demonstrated on this record that his well-substantiated and pre-vaccination comorbid condition of diabetic neuropathy does not "more likely than not" account for much of his ongoing/anticipated harm, but he is still entitled to a substantial award of pain and suffering specific to his GBS, commensurate with what similarly-situated claimants have received.

I will award no lost wages in this case, however—past or future. In addition to not linking earning losses to his GBS (as opposed to identified ongoing diabetic neuropathy complications), Petitioner has (despite having *three years* to prepare) failed to corroborate his claimed lost wages, which remain wholly speculative. While the record suggests that Petitioner was employed before his vaccination, and thus may have had some wage loss during his GBS treatment and recovery, he has not substantiated these losses with any of the specificity required.

Both sides have also offered life care planner evidence to support their positions on future care needs. I will decide the scope of future care costs after this Decision, via a hearing (at which time both sides may offer testimony from their life care planners—although such testimony must not rely on *existing* expert opinions on the scope of Petitioner's harm, but instead the fact findings in this Decision). The amount of the Medicaid lien (which according to the parties would reflect all unreimbursed treatment expenses) will be determined later, as well.

I.    **Factual Summary**

A.    *Pre-Vaccination Diabetes and Other Relevant Comorbidities*

Mr. Alonzo's pre-vaccination history bears significantly on the damages to be awarded (even though otherwise his history was not an impediment to entitlement). Accordingly, that history merits more explication than in cases where entitlement was otherwise resolved.

The record reveals that Petitioner experienced many comorbid conditions long before his 2016 vaccination. For example, he had a history of peripheral vascular disease, radiating lumbar radiculopathy, and lumbar spondylosis, among other things. Ex. 2 at 5–11, 9, 24, 45, 54. More significantly, he had been diagnosed with uncontrolled diabetes mellitus type II, with well-documented history of consistently elevated glucose measurements and A1C measurements. And he had been diagnosed with a peripheral autonomic neuropathy. Ex. 2 at 28–30. Indeed, prescription records filed in this case for a ten-year period through mid-2017 reveal that Petitioner had a gabapentin prescription (used for neuropathic pain) since at least January 2012 (six years

2

pre-vaccination), although it is unclear how frequently this medication was actually taken. Ex. 1 at 33, 59, 65.

Numerous records filed in this case specifically establish Petitioner's difficulties in controlling his type II diabetes—as well as the sequelae he experienced due to it, even before his vaccine injury. *See, e.g.*, Ex. 2 at 45 (October 2013 treater visit, noting that Petitioner had type II diabetes and his "blood glucose on today's visit was 457 non-fasting very uncontrolled"),[1] 40–47 (2015 physical exam, non-fasting glucose was elevated (at 411), and the treater noted that Petitioner was not taking his medication, while also observing that Petitioner suffered from uncontrolled hypertension causing headaches), 30–32 (June 2015 visit revealed elevated fasting glucose and A1C levels[2] consistent with uncontrolled type II diabetes, as well that Petitioner's "abnormal responses to autonomic challenges . . . suggest autonomic dysfunction," which was later confirmed by testing).

In the summer of 2015, Mr. Alonzo saw a podiatrist for "evaluation of burning, tingling pain bilateral feet." Ex. 2 at 28. On physical examination, he displayed decreased light touch and sharp dull sensation; the treater opined he suffered from idiopathic peripheral autonomic neuropathy, and Petitioner was advised to continue with his gabapentin. *Id.* at 28–29. At the end of 2015, he had a routine check-up with his primary care physician ("PCP"), and again his non-fasting glucose was elevated at 231. *Id.* at 22. The treater also referred him to physical therapy for lumbar radiculopathy. *Id.* at 24. Petitioner's diabetes was again characterized as uncontrolled in 2016. *Id.* at 8–9. More significantly, in 2016 lower extremity arterial testing revealed the possibility that Petitioner was suffering from "advanced autonomic dysfunction (Diabetic Autonomic Neuropathy or DAN if the patient has diabetes)." Ex. 2 at 52. Thus, it cannot be disputed in this case that Petitioner's GBS occurred *in the context* of an existing neuropathic injury attributable to his uncontrolled type II diabetes.

---

[1] A fasting blood sugar level of 99 mg/dL or lower is normal; 100 to 125 mg/dL indicates prediabetes; and 126 mg/dL or higher indicates diabetes. For a glucose tolerance test, which measures blood sugar two hours after drinking a sugary drink, a blood sugar level of 140 mg/dL or lower is considered normal; 140 to 199 mg/dL is considered prediabetes; and 200 mg/dL or higher indicates diabetes. Centers for Disease Control, Diabetes Tests, available at https://www.cdc.gov/diabetes/basics/getting-tested.html (last visited August 9, 2023).

[2] The A1C test is a blood test that provides information about the average levels of blood glucose, also called blood sugar, over the past 3 months, which can be used to diagnose type 2 diabetes and prediabetes. *Nicholson v. Sec'y of Health & Hum. Servs.*, No. 17-1416V, 2022 WL 14437541, at *23 (Fed. Cl. Spec. Mstr. Sept. 22, 2022) (citing *The A1C Test & Diabetes*, NIH, National Institute of Diabetes and Digestive and Kidney Diseases, www.niddk.nih.gov/health-information/diagnostic-tests/a1c-test (last visited August 9, 2023)).

B.    *Vaccination and GBS Diagnosis*

Two weeks after his December 7, 2016 receipt of the flu vaccine, Petitioner presented to the Emergency Department ("ED") at New York Presbyterian Hospital for gait instability, bilateral leg pain, and chest pain. Ex. 3 at 10. He also reported lower back pain that had been present for "years," and was able to ambulate with a cane, and once again blood testing revealed a high fasting glucose level. *Id.* at 26, 49. Petitioner was released—but two days later (December 23, 2016) was hospitalized at the Moses Campus of Montefiore Medical Center ("M-MMC"). Ex. 4 at 5.

Records from this hospitalization incorporate earlier records from Petitioner's medical history documenting his uncontrolled diabetes and diabetic neuropathy. Indeed, testing performed at this time relevant to diabetes (such as measuring A1C levels) yielded results consistent with an existing problem. Ex. 4 at 36, 554. Petitioner's treating providers thus concluded (based both upon exam evidence and the medical history) that Petitioner had an "ataxic variant of GBS *on top of* chronic severe diabetic neuropathy." *Id.* at 45, 94 (emphasis added).

Significantly, even at this early phase of Petitioner's GBS course, treaters could distinguish to some degree the impact of his preexisting type II diabetes-caused neuropathy from his more recent neurologic symptoms. For example, in a December 28, 2016 record, a neurologist noted that Petitioner's EMG showed "a severe, distal sensorimotor polyneuropathy with mixed axonal and demyelinating features, which is *likely related to impaired glycemic control in this diabetic patient.*" Ex. 4 at 123 (emphasis added). The neurologist also pointed to "evidence of focal enlargement of the median nerves at the wrists and ulnar nerves at the elbows when visualized with ultrasound, suggesting multiple entrapments likely related to his underlying diabetes." *Id.*

As a result, by the end of December 2016 another neurologist who encountered Petitioner had diagnosed him with "[d]iabetic polyneuropathy *associated with type 2 diabetes mellitus* (Chronic)" and "[a]xonal GBS." Ex. 4 at 45 (emphasis added). In particular, the neurologist noted that Petitioner's EMG "shows mixed axonal and demyelinating neuropathy most likely due to diabetes," and thus such testing results confirmed that his GBS was occurring "on top of chronic severe diabetic neuropathy." *Id.*

After his discharge from in-patient rehabilitation, Petitioner was admitted to a different facility in January 2017 for further rehabilitation. Ex. 4 at 521. Three months later, in April 2017, it was noted that he was able to use a rolling walker to ambulate, and the power in his lower extremities was 4-5/5. *Id.* at 77. Although he subsequently remained at this facility through September 2017, the records reveal this was due to his inability to find outside housing, rather than the ongoing need for rehabilitation therapy, since he had been discharged from all therapies well before his release. *See, e.g.*, Ex. 6 at 69–70, 76, 233, 527.

In the fall of 2017, Petitioner continued to display testing results confirming the ongoing presence of uncontrolled diabetes. Ex. 24 at 22, 28–29. By contrast, he did not reveal significant ongoing GBS sequela. Thus, after he sought medical treatment in late November for lower back pain and a lower back abscess, he as noted to be ambulating well (albeit with a cane). Ex. 28 at 27, 52, 61 (emphasis added). Petitioner received another podiatry evaluation in December 2017, but his main complaints were itchy dry skin and some joint pain—and although he did display some sensory sensitivities and parasthesias, he was assessed with neuropathy secondary to his type II diabetes. Ex. 24 at 74–76. At a concurrent visit in early December to his PCP, Mr. Alonzo's GBS history was noted, but more concern was expressed about the blood test results consistent with uncontrolled diabetes, as well as vascular issues and chronic kidney disease. Ex. 24 at 48, 52–54. A visit around this time with a nephrology specialist confirmed that Petitioner's kidney issues were likely a product of his uncontrolled type II diabetes. Ex. 24 at 64, 67–69.

C.      *Treatment from 2018 to the Present*

Petitioner has filed medical records for the ensuing five years, through the end of 2022, but they all tell the same story: that of an individual with *resolved* GBS but *unresolved* type II diabetes—resulting in many identifiably-related secondary conditions and sequelae.

In February 2018, for example, Petitioner presented to the ED at M-MMC for "kidney failure," and was discharged after a five-day hospitalization. Ex. 26 at 5. He was diagnosed with "renal failure," and although his prior GBS was noted, he did not display the kinds of neurologic symptoms associated with it, and his ambulation was deemed reasonable. *Id.* at 33, 281. He returned to the ER that summer complaining of lower abdominal and back pain, but displayed full strength on a neurologic exam. Ex. 10 at 6, 8, 12. He was hospitalized from early June to mid-July, and was ultimately diagnosed with pneumonia, causing several complications. *Id.* at 26. But any weakness or symptoms that might arguably seem comparable to GBS were reported by Petitioner to be "new to him" (*Id.* at 114), and he was noted to have no then-existing ambulation or mobility issues (although he had used a walker). *Id.* at 152. No treaters involved in this event attributed his condition in any regard to his prior GBS. *See generally* Ex. 10.

For the remainder of 2018, Petitioner sought medical care on several occasions—and although he sometimes reported symptoms that could (in isolation) "look" like GBS sequelae, more often than not the context suggested no association. Thus, Petitioner had a post-hospitalization check-up in August 2018, at which time his diabetes-related neuropathy was noted but not his GBS. Ex. 14 at 2, 5–6. That same month he had an evaluation for a renal transplant. Ex. 32 at 2. Although it was stated at this time that weakness in his legs obligated him to use a walker, he had a normal neurologic examination with intact cranial nerves and symmetrical intact reflexes, and he did not report difficulties otherwise in functioning normally. *Id.* at 5, 30–31. Fatigue that was reported during a related cardiology consult in September 2018 was deemed

5

"much more prevalent over the past few months" (Ex. 29 at 8)—as opposed to since GBS treatment, which ended in the spring of 2017—but Petitioner did not at this time display on physical exam problems like gait abnormality was noted. Ex. 29 at 9. By contrast, Petitioner received treatment for severe diabetic retinopathy in October (a direct sequela of his type II diabetes). Ex. 18 at 6.

Records from 2020 are comparable in terms of what is revealed. A PCP visit in January 2020 confirmed elevated glucose and A26 levels—while a neurologic exam performed at the same time showed normal strength and intact sensation bilaterally. Ex. 34 at 44, 47–48. An exam Petitioner obtained the following month in connection with his kidney transplant inquiry also noted mostly normal gait and reflexes, albeit with some weakness (attributed partially to deconditioning). Ex. 32 at 73–74. In a psychosocial assessment around this time, Petitioner reported "no need for assistance from a caregiver" and "no need for assistance with ambulation" in the past six months. *Id.* at 63.

Later that spring, Petitioner returned to the ED at M-MMC, complaining of symptoms he attributed to a failure to maintain his hypertension and diabetes medications—but neurologic evaluations at this time (again) revealed intact sensation and motor function with no weakness. Ex. 30 at 18, 415. Additional visits to the ED that same month (at which times Petitioner complained of post-dialysis headache) yielded consistent findings. *See, e.g.*, Ex. 30 at 321, 324. Another ED visit (likely, based on the records, due to pneumonia) in June 2020 also produced a normal neurologic exam. *Id.* at 70. And pre-operative evaluations for eye surgery to treat cataracts also observed intact strength and sensation, bilaterally. Ex. 34 at 16.

Petitioner has filed other medical records reflective of his treatment from 2021 through the end of 2022. But none are inconsistent with what has already been described for a period more than two and one-half years after Petitioner's primary GBS treatment ended. In effect, they underscore that (a) Mr. Alonzo has received large amounts of medical treatment, (b) his type II diabetes remains uncontrolled, but (c) his motor/ambulatory functionality remains largely good, and (d) he has not displayed any significant neurologic symptoms that might be considered sequelae of his previously-diagnosed GBS, but instead reflect other likely intervening causes or sources.[3]

---

[3] One more recent record (signed by a treater around the time Petitioner offered his damages brief in this case) purports to identify GBS-related sequelae, but it is facially unhelpful. *See generally* Ex. 50. On December 6, 2022, Petitioner saw neurologist Casilda Balmaceda, M.D., (whom he first visited in May 2021—more than two years after the case was filed) for "Dr. Pignaanili, guiollaui ba are syndeome [sic]." Ex. 50 at 1. This visit, moreover, occurred in the context of the parties' efforts to brief their damages dispute.

Dr. Balmaceda wrote that Petitioner had a flu vaccine in 2016 and developed GBS. Ex. 50 at 1. But the record contains numerous misspellings, contradictions, and errors. Thus, Dr. Balmaceda writes "12/22 he had GBS 2017." *Id.* She also writes both "he has not been weak" and in the same sentence, "feels week [sic]," and in the following sentence, "now better when off the pt he notices weakeness [sic]." *Id.* On physical examination, she notes normal coordination and no ataxia, and a normal gait, plus notes normal reflexes and a normal sensory exam in the bilateral lower extremity.

## II.    Expert Input

In order to untangle Petitioner's concurrent conditions, and provide some understanding of what future care is appropriate, both sides have offered expert opinions on Petitioner's medical history.

### A.    *Petitioner's Expert – Dr. Justin Willer*

Dr. Willer, a neurologist, has offered two reports in this matter pertaining to the disputed damages issues. Report, dated July 19, 2022, filed as Ex. 40 (ECF No. 99-2) ("First Willer Rep."); Report, dated December 14, 2022, filed as Ex. 45 (ECF No. 103-1) ("Second Willer Rep."). Dr. Willer also performed an in-person medical exam of Petitioner—albeit in the context of this case rather than as part of Petitioner's contemporaneous treatment. *See* Exam Report, dated June 22, 2022, filed as Ex. 39 (ECF No. 99-1) ("Willer Exam").

Dr. Willer received his undergraduate degree from Columbia College of Columbia University and his medical degree from the University of Health Sciences/The Chicago Medical School. *See Curriculum Vitae*, dated July 26, 2022, filed as Ex. 42 (ECF No. 99-4) ("Willer CV") at 1. Beginning in 1995, he has held hospital appointments at University Hospital, Long Island College Hospital, Maimonides Hospital Medical Center, and Kings County Medical Center, but he has not treated pediatric patients since 2000. Willer CV at 1; First Willer Rep. at 1. He has also held academic appointments as a Neuromuscular Consultant and Assistant Professor of Clinical Neurology at the State University of New York, HSC at Brooklyn. Willer CV at 1. He is licensed to practice medicine in New York, New Jersey, and Florida, and is board certified by the American Board of Psychiatry and Neurology, with added qualifications in clinical neurophysiology, and American Board of Electrodiagnostic Medicine. Willer CV at 2; First Willer Rep. at 1.

### *Expert Exam*

The in-person exam report is based on an actual visit Dr. Willer held with Petitioner in June 2022. Willer Exam at 2. In it, Dr. Willer proposes that Petitioner's neurologic condition (while normal in several respects) also featured motor deficiencies (unsteady gait, abnormal Romberg testing), absent ankle reflexes, and sensory issues specific to pinprick testing. *Id.* He goes

---

*Id.* at 2. However, she also appears to further note right foot drop, distal leg weakness (right more than left), right foot and leg weakness, and persistent pain "likely related" to his GBS. *Id.* Then, she diagnoses him with chronic inflammatory demyelinating polyneuritis/polyneuropathy ("CIDP")—an exclusionary diagnosis for a GBS-flu vaccine Table claim—but prescribes hydroxyzine, an antihistamine unrelated to GBS or CIDP, and also writes "Notes: 1, tests to lawyer." *Id.* Because of the circumstances in which this record was created, and its facial inconsistencies, I do not give it significant weight.

on to assert (without offering a basis) that "the dysesthetic pain that Mr. Alonzo currently experienced is causally related to [GBS] as it is identical to the pain that he experienced at the onset of [his] GBS]," that "it is intractable and on a more likely than not basis will not improve further," and that ongoing pharmaceutical, psychiatric, and neurologic care are called for as a result." *Id.* at 4.

Notably, however, Dr. Willer's exam included review of some medical records—but *only* those from after vaccination, or around the time Petitioner's GBS was diagnosed. Willer Exam at 2–3. In addition, the "past medical history" section of the exam report makes only cursory mention of Petitioner's pre-existing diabetes, and no mention at all of his previously-diagnosed diabetes-associated peripheral neuropathy. Willer Exam at 1–2. And it references Petitioner's claim that before vaccination, Petitioner "did not experience weakness, pain, numbness or tingling in his arms and legs," and was "compliant with diabetes medication, with fasting blood sugars in the 100s"—assertions that are all rebutted by the actual pre-vaccination medical record in this case. *Id.* at 1.[4]

*First Report*

Dr. Willer's first expert report spends several pages listing the materials he considered, and then a few more setting forth Petitioner's overall medical history (although it omits discussion of Petitioner's pre-vaccination health). First Willer Rep. at 3–10. In fact, Dr. Willer unpersuasively suggests Petitioner's past medical history was largely uneventful, summarizing it in the length of a paragraph that only cursorily mentions his documented type II diabetes, and refers not at all to Petitioner's well-documented struggles in controlling it (as well as its noted secondary impacts on his health). *Id.* at 11. His records summary contains no reference to anything that occurred in Petitioner's pre-vaccination history. *Id.* at 11–12.

From there, Dr. Willer offers the view that Petitioner's post-vaccination pain and other impairments are the product of his GBS, rather than established diabetic neuropathy. First Willer Rep. at 11. These ongoing issues, he opines, support the extensive amounts of future care that Petitioner is demanding in this case (as addressed below in more detail). In so doing, however, he largely echoed the conclusory assertions contained in his shorter exam report. *Id.* at 11–12. Indeed, he references the exam as support for his opinion. *Id.* at 12. He also cites some of Petitioner's prior witness statements. *Id.* at 12–13. He does not, however, grapple in any way with pre-vaccination evidence establishing the severity of Petitioner's concurrent diabetic neuropathy diagnosis—*or* the post-vaccination record of those issues being deemed responsible for his ongoing symptoms *rather* than GBS.

---

[4] Perhaps anticipating such criticisms, Dr. Willer states in the introduction to the exam report that Petitioner was a "poor historian even with a Spanish translator." Willer Exam at 1. Of course, this is not an *excuse* for unfounded medical conclusions, especially given the nature of the pre-vaccination record and what it so consistently establishes.

*Second Report*

Dr. Willer's second report[5] endeavors to refute points made by Respondent's expert, Dr. Jeffrey Cohen. Although Dr. Willer provides no review of the pre-vaccination history records (and indeed does not even identify them as having been evaluated as part of the preparation of the second report), he maintains that Dr. Cohen made errors in that review (at least in opining that Petitioner had experienced "large fiber diabetic neuropathy"). Second Willer Rep. at 1. In so doing, he denied there existed a confirmed diagnosis for pre-GBS diabetic neuropathy (a contention, I will note, that the medical records do not support). *Id.* at 2.

In so doing, Dr. Willer engaged in a point-by-point effort to rebut each item of evidence that supported the existence of an ongoing neuropathy concurrent with GBS. For example, he discounted the significance of Petitioner's gabapentin prescription, arguing that it is "used for neuropathic pain other than neuropathy," or prescribed incorrectly. Second Willer Rep. at 2. He denied that Petitioner had ever received a "confirmed" diabetic neuropathy diagnosis before, or at the time of, Petitioner's GBS hospitalization—citing verbatim records that *do* associate the results with diabetes (e.g., Ex. 4 at 40, 90–94) but arguing that the same records were also consistent with GBS. *Id.* at 2–3. He deemed Dr. Cohen's analysis of EMG testing from December 2016 (which as already noted confirmed the presence of the diabetic neuropathy) as "incorrect," even though Dr. Cohen does not dispute the GBS diagnosis (nor is it even *in* dispute). *Id.* at 2–3.[6]

Dr. Willer in particular attempted in his final written report to establish that Petitioner has consistently reported gait disturbances or ataxia, which he seems to associate with GBS. *See* Second Willer Rep. at 2–4. First, he denied the existence of pre-vaccination ataxia, observing some instances from 2015 records in which neurologic exams were either (in his estimation) incomplete, or otherwise observed normal motor function. *Id.* at 2. Second, he noted that normal gait findings were observed post-vaccination by many treaters—although Dr. Willer contested the medical reliability of such exams if not performed by neurologists. *Id.* at 3. When normal gait was observed

---

[5] This report was filed at the same time Petitioner filed his damages brief—and hence was literally not in compliance with my May 2, 2022 Scheduling Order (ECF No. 91)—which set July 29, 2022, as a hard deadline for filing documents or expert reports in connection with the damages dispute. I have considered it nevertheless (as well as Dr. Cohen's responsive report filed thereafter), although due to its unapproved, eleventh-hour character I give it less weight than the timely-filed first report from Dr. Willer.

[6] In other places in the record (for example, 2021 EMG/NCS testing—notably, performed almost five years post-vaccination, in a case involving a known acute injury) Dr. Willer quibbles with the results (which confirm the diabetic neuropathy) directly as "technically unsatisfactory," maintaining that "it is suspicious for a patient with a radiculopathy to have zero chronic denervation," and concluding that it therefore has "zero diagnostic value." *Compare* Second Willer Rep. at 4 *with* Ex. 36 at 1–5. Respondent, however, also did not deem this testing result as worthy of weight, albeit for other reasons—and in any event preponderant record evidence strongly supports the diabetic neuropathy diagnosis, post and pre-vaccination, without the need for this later testing to corroborate it.

in connection with Petitioner's renal treatment (which even Dr. Willer did not attempt to characterize as a GBS-related condition), Dr. Willer opined that "it is not possible for Mr. Alonzo's gait to have been normal"—relying on either gait issues displayed *at the time of* Petitioner's GBS acute presentation in December 2016, his in-patient release in January 2017, or at his own exam of Petitioner *more than five years later*. *Id.* at 3–4.

  **B.**   *Respondent's Expert – Dr. Jeffrey Cohen*

  Dr. Cohen, a neurologist like Dr. Willer, prepared two expert reports for Respondent. Report, dated August 22, 2022, filed as Ex. A (ECF No. 101-1) ("First Cohen Rep."); Report, dated January 13, 2023, filed as Ex. F (ECF No. 104-1) ("Second Cohen Rep.").

  Dr. Cohen received his undergraduate degree from Tulane University, master's degree in healthcare administration from the University of Denver, and medical degree from the University of Oklahoma. *See Curriculum Vitae*, dated August 31, 2022, filed as Ex. B (ECF No. 101-6) ("Cohen CV") at 1; First Cohen Rep. at 1. He completed a residency in neurology at Mount Sinai Hospital in New York, New York, a clinical and research fellowship in neurology at the Massachusetts General Hospital, and a fellowship in peripheral nerve disease at the Mayo Clinic in Rochester, Minnesota. Willer CV at 1; First Cohen Rep. at 1. He is the Director of the ALS Clinic and Diamond Endowment Project/Scientific Review Committee in Neurology at Dartmouth-Hitchcock Medical Center in Lebanon, New Hampshire. Cohen CV at 2. He has also held academic positions as a professor of neurology at the Geisel School of Medicine at Dartmouth in Hanover, New Hampshire. First Cohen Rep. at 1–2. He is licensed to practice medicine in New Hampshire, and is board certified by the American Board of Psychiatry and Neurology, American Board of Electrodiagnostic Medicine, American Academy of Pain Management, American Society of Neurorehabilitation. Cohen CV at 3. He has also authored a number of peer reviewed articles related to neurology, specifically peripheral nerve disorders. First Cohen Rep. at 2.

*First Report*

  Dr. Cohen's first report included a review of Petitioner's medical history—but in contrast to Dr. Willer's exam and initial report, he included extensive commentary on Petitioner's pre-vaccination record and the history of poorly-controlled diabetes it revealed. First Cohen Rep. at 2–3. He also opined that the records suggested that Petitioner's GBS recovery was "excellent," while noting that numerous treatment events after January 2017 were demonstrably the product of diabetes rather than deemed to be GBS-related. *Id.* at 4–5.

  Dr. Cohen next provided a brief description of GBS, contrasting it with the diabetic neuropathy of the kind Petitioner also suffers from. First Cohen Rep. at 5–6. GBS, he noted, is typically monophasic, quickly reaching nadir within a few weeks, and "the clinical picture" for

GBS will be characterized more by weakness and sensory loss than pain. *Id.* at 5–6. Although recovery from GBS may not occur until some time after nadir, it is not progressive in character. A diabetic neuropathy, however, *is* usually progressive (especially when the product of uncontrolled diabetes), and can feature renal failure and retinopathies as well as other neuropathic symptoms. *Id.* at 5–6; E. Feldman et al., *Diabetic Neuropathy*, 5 Nature Reviews – Disease Primers 1, 2 (2019), filed as Ex. A Tab 1 (ECF No. 101-2) ("Feldman"). Pain is also more common than with GBS, although diabetic neuropathy can later impact motor neurons. First Cohen Rep. at 6; Feldman at 2. Overall, Petitioner's history post-GBS recovery in 2017 was in Dr. Cohen's view far more consistent with the impact of diabetic neuropathy than GBS. *Id.* at 6, 9.

Next, Dr. Cohen commented on Dr. Willer's exam and first report. He emphasized the extent to which Petitioner's actual medical history had not been discussed (beyond the allowance by Dr. Willer that Petitioner may not have accurately reported his prior experience with diabetic neuropathy), and also how Petitioner's experiences since 2017 were consistent with the effects of an existing, progressive diabetic neuropathy. First Cohen Rep. at 6–7.

Because, in Dr. Cohen's view, most of Petitioner's treatment history from the middle of 2017 onward was not focused on GBS, future care expenses deemed necessary by Petitioner's life care planner in fact did not reflect treatment of GBS sequelae. Indeed, other than Dr. Willer (in 2022), Dr. Cohen noted, Petitioner had not even seen a neurologist since the time of his GBS-related hospitalization. First Cohen Rep. at 7. And other life care plan recommendations, such transportation to avoid risks posed by an unsteady gait, were inconsistent with evidence of Petitioner's actual condition—and in any event reflected diabetes sequelae. *Id.* at 8. Dr. Cohen thus opined that the life care plan submitted by Petitioner, which expressly relied on Dr. Willer's opinion, was not well-founded, given the extent to which Petitioner's ongoing issues were unrelated to his GBS. *Id.*

*Second Report*

Dr. Cohen also prepared a supplemental, two-page letter report reacting to Dr. Willer's second report. *See generally* Second Cohen Rep. He reiterated his earlier opinion, but offered some additional commentary on the nature of diabetes and its complications. Second Cohen Rep. at 1. In Dr. Cohen's view, diabetes features three major complications: "neuropathy, nephropathy, and retinopathy." *Id.* And a common subset of diabetic neuropathy is diabetic *sensory* neuropathy ("DSN"), which can feature autonomic harm to the small nerve fibers but without motor involvement. *Id.* As a result, testing used to evaluate small fiber neuropathies—a skin biopsy—is useful. *Id.*

In this case, Mr. Alonzo had been evaluated as having abnormal autonomic responses, based on EMG and nerve conduction tests. Second Cohen Rep. at 1. That testing, Dr. Cohen

opined, actually had demonstrated "axonal predominance, a feature of DSN but not usually a feature of GBS," where testing more commonly reveals evidence of demyelination. *Id.*; Ex. 4 at 45, 123 (showing abnormal NCV and EMG studies from December 30, 2016). Thus, given that Petitioner's diabetic neuropathy diagnosis predated his vaccine-caused GBS, and given the progressive nature of diabetic neuropathies (as well as Petitioner's demonstrated lack of control over his type II diabetes), the record provided additional support for the conclusion that Petitioner's symptoms from 2017 on were largely related to his diabetes. (This also included the pain he complained of in his feet, which he had experienced even before vaccination). Second Cohen Rep. at 2.

## III.   Parties' Damages Positions

### A.   *Unreimbursed Expenses*

Petitioner represents that all previously unreimbursed medical care costs associated with his injury were covered under Medicaid, meaning they will be wholly captured by a Medicaid Lien. Br. at 41. As of the time of filing of Petitioner's damages brief, however, the sum still remained to be calculated, and Petitioner has not in the ensuing eight months filed anything establishing what is likely requested (although he allows that untangling in this Decision what medical costs are specific to GBS versus Petitioner's other, unrelated neuropathic symptoms would render this issue "ripe"). *Id.* Because this number remains unrevealed, Respondent offers no comment on it. Opp. at 52.

Petitioner also has made a demand for future care, reflected in the life care plan provided by Nurse Linda Latjerman—a total of $3,246,832.07. Br. at 40; Life Care Plan, dated July 29, 2022, filed as Ex. 43 (ECF No. 100-1) ("Latjerman Plan"). Nurse Latjerman repeatedly acknowledges in her plan, however, that many of the recommended care provisions are the result or reflective of Dr. Willer's opinions. *See, e.g.*, Latjerman Plan at 6–8.

Respondent maintains in reaction that *no* future care has been justified. Opp. at 47–53. Relying on the opposing life care plan offered by Nurse Nancy Fox (and the explanatory report that accompanied it) he argues that the elements of this plan are based on speculative and unsubstantiated views about the nature of Petitioner's injury provided by Dr. Willer, ignoring the degree to which Petitioner's current and expected sequelae were a product of his preexisting diabetic neuropathy. *Id.* at 48–50; Fox Report, dated Aug. 25, 2022, filed as Ex. C (ECF No. 101-7); Fox Life Care Plan, dated August 25, 2022, filed as Ex. D (ECF No. 101-8). The plan also lacks insurance offsets, includes care elements that the evidence does not suggest Petitioner requires given his existing needs, and that the pain and suffering award could be fashioned to take into account any possible future care issues. *Id.* at 50–52.

B.     *Lost Wages*

Petitioner maintains that regardless of his pre-vaccination health, he was then a "fully functional and able" 46-year old, employed as a barber and earning $12,500.00 per year. To substantiate this sum, he has offered only two items of proof: his affidavit (Ex. 16) and a co-worker's handwritten (in Spanish) affidavit (although the statement as translated makes no mention whatsoever of the Petitioner's employment (*See* Exs. 52–53)). Based on these two items of evidence, he proposes he should receive past lost wages for six years, from December 2016 to the time of the filing of the damages brief, or a total of $72,500.00. Br. at 43.

In addition, he calculates that (based on the fact that he is now 52 years old) he could have expected 18 additional years of work, but for his injury. Br. at 44. He offers an unsworn statement from Paul Peralta, a construction company manager, who vouches for Petitioner's competence, and represents he would have hired him but for his injury. Ex. 38. Petitioner, however, relies on his assertions of prior work as a barber for the future lost wages sum, calculating them to amount to $225,000.00, albeit needing to be reduced to present value. Br. at 44.

Respondent denies that Petitioner has substantiated any wage loss in this case. Opp. at 53–55. He notes that Petitioner has not substantiated his employment claims with any actual evidence showing he did in fact receive compensation for work in the amounts demanded, and disputes the value of the two witness statements. *Id.* at 53–54. Although Respondent does not contest that Petitioner's employment was referenced in medical records filed in this case, he notes that the kind of "hard" evidence (income statements, tax returns, etc.) have never been filed. *Id.* at 54. In addition, Respondent deems Petitioner's future wage loss claim speculative, especially since the comorbidities that Respondent considers as explanatory of Petitioner's current sequelae and care needs are more likely the reason Petitioner could not work. *Id.* at 54–55.

C.     *Pain and Suffering*

Petitioner demands $250,000.00 in pain and suffering, the full amount allowed under the Vaccine Act. Br. at 37–39. In so proposing, he relies heavily on Dr. Willer's assessment of Petitioner's post-vaccination condition—and the idea that not only was treatment significant, but (a) it left him with significant sequelae (including abnormal gait), and (b) that he has not suffered from an even more severe diabetic neuropathy that explains his ongoing poor health. *Id.* at 38–39. As a comparable case, he cites *Hood v. Sec'y of Health & Hum. Servs.,* No. 16-1042V, 2021 WL 5755325 (Fe. Cl. Spec. Mstr. Oct. 19, 2021), where a different special master awarded past pain and suffering in the amount of $200,000.00 to a petitioner who experienced GBS over a six-year period, as alleged here. Br. at 38; *Hood,* 2021 WL 5755324, at *10. In addition, the *Hood* petitioner

received a future component in the sum of $1,000.00 per year, since the record showed he had ongoing debilitating symptoms. *Id.* Here, Petitioner maintains his condition is even more severe. Br. at 39–40.

Respondent contends that a total award of $165,000.00 for past pain and suffering is appropriate. Opp. at 34. He deems Petitioner's circumstances distinguishable from *Hood,* where the claimant had offered substantive evidence of the impact his injury had on his physical job as a butcher plus his physical health. *Id.* at 35. By contrast, Respondent noted a number of decisions in which individuals experiencing GBS due to the flu vaccine received less than $200,000.00 for pain and suffering. *Id.* at 36; *Presley v. Sec'y of Health & Hum. Servs.,* No. 17-1888V, 202 WL 1898856 (Fed. Cl. Spec. Mstr. Mar. 23, 2020) ($180,000.00 for worse course and better-documented post-injury limitations); *Bircheat v. Sec'y of Health & Hum. Servs.,* No. 19-1088V, 2021 WL 3026880 (Fed. Cl. Spec. Mstr. June 16, 2021) ($170,000.00 awarded despite severe course and difficult rehabilitation); *Johnson v. Sec'y of Health & Hum. Servs.,* No. 16-1356V, 2018 WL 5024012 (Fed. Cl. Spec. Mstr. July 20, 2018) ($180,000.00 awarded, where ongoing sequelae solely related to GBS were established). Respondent thus deems his proposed figure to be on such a spectrum, if lower.

Future pain and suffering, however, is not (in Respondent's view) justified by this record or applicable case law. Opp. at 37–46. Some "objective evidence of ongoing neurologic deficits or symptoms" related to GBS must be demonstrated for a future component, but are absent from this record. *Id.* at 37–38. But after his initial care, Petitioner did not even see a neurologist again before late 2021, and is receiving no GBS-specific treatment. *Id.* at 38. By contrast, any current health issues he is experiencing are related solely to his uncontrolled diabetes and diabetic neuropathy—a through line in his health history since before vaccination. *Id.* And Dr. Willer's efforts to opine otherwise ignore large pieces of the medical history, and the opinion he offers far less reliable or persuasive than what Dr. Cohen has offered. *Id.* at 40–45.

## IV.    Relevant Law on Damages Determinations

### A.    *General Considerations*

A petitioner may recover "actual unreimbursable expenses incurred before the date of judgment awarding such expenses which (i) resulted from the vaccine-related injury for which the petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(A)(i) – (iii). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.,* No. 93-0092V, 1996 WL 147722, at *22–23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

As noted above, this provision of the Act permits recovery of costs *to be incurred* for future care, although such costs must be shown to be "reasonably necessary." Section 15(a)(1)(A)(iii)(I) – (II). The meaning of the phrase "reasonably necessary" is somewhat imprecise, as I have recognized in other cases. *Barone v. Sec'y of Health & Hum. Servs.,* No. 11-707V, 2016 WL 3577540 (Fed. Cl. Spec. Mstr. May 12, 2016) (*citing I.D. v. Sec'y of Health & Human Servs.*, No. 04–1593V, 2013 WL 2448125, at \*6 (Fed. Cl. Spec. Mstr. Apr. 19, 2013) (defining "reasonably necessary" to mean "that which is required to meet the basic needs of the injured person . . . but short of that which may be required to optimize the injured person's quality of life"); *see also Bedell v. Sec'y of Health & Hum. Servs.,* No. 90-765V, 1992 WL 266285 (Cl. Ct. Spec. Mstr. Sept. 18, 1992) (defining the term to mean more than merely barely adequate, but less than the most optimal imaginable). And it goes almost without saying that such costs must *also* pertain to care associated with the alleged injury or its sequelae.

    B.    *Pain and Suffering*

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000.00." Section 15(a)(4). There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D.*, 2013 WL 2448125, at \*9 ("[a]wards for emotional distress are inherently subjective"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at \*3 (Fed. Cl. Spec. Mstr. May 22, 1996).

Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at \*9 (citing *McAllister v. Sec'y of Health & Hum. Servs.*, No 91-1037V, 1993 WL 777030, at \*3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)). I may consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g., Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009). And, of course, I may rely on my own experience adjudicating similar claims. *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated that the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by a decision from several years ago. *Graves v. Sec'y of Health & Hum. Servs.*, 109 Fed. Cl. 579 (Fed. Cl. 2013). *Graves* maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Graves,* 109 Fed. Cl. at 589–90. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 593–95. Under this alternative

approach, the statutory cap merely cuts off higher pain and suffering awards—it does not shrink the magnitude of all possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it offers a reasoned understanding of the issues involved in pain and suffering calculations, and underscores the importance of evaluating pain and suffering *first and foremost* on the basis of the injured party's own experience.

Program decisions have generally recognized that GBS is a particularly frightening injury, given its nature and progression. *Enstrom v. Sec'y of Health & Hum. Servs.*, No. 20-2020V, 2023 WL 345657, at *6 (Fed. Cl. Spec. Mstr. Jan. 20, 2023) (awarding $170,000.00 in pain and suffering) (*citing Gross v. Sec'y of Health & Human Servs.*, No. 19-0835V, 2021 WL 2666685, at *5 (Fed. Cl. Spec. Mstr. Mar. 11, 2021)). As a result, it is common to award actual pain and suffering amounts in such cases in excess of $100,000.00—and typically even more.[7] *Enstrom,* 2023 WL 345657, at *6 n.14 (observing that in the majority of prior decisions, actual pain in suffering awards made in reasoned decisions involving GBS as the injury did not award less than $125,000.00).

C.     *Lost Wages – Past and Future*

The Vaccine Act provides for recovery of "actual and anticipated loss of earnings determined in accordance with generally recognized actuarial principles and projections," where the injured party's "earning capacity is or has been impaired by reason of such person's vaccine-related injury." Section 15(a)(3)(A). The calculation of lost earnings damages must be performed in a "cautious manner 'in accordance with generally recognized principles and projections.'" *Brown v. Sec'y of Health & Hum. Servs.*, No. 00-182V, 2005 WL 2659073, at *6 (Fed. Cl. Spec. Mstr. Sept. 21, 2005) (*citing* Section 15(a)(3)(A)).

Compensation awarded for a petitioner's anticipated loss of earnings may not be based on speculation. *J.T. v. Sec'y of Health & Hum. Servs.*, No. 12-618V, 2015 WL 5954352, at *7 (Fed. Cl. Sept. 17, 2015) (indicating Section 15(a)(3)(A) "does not envision that 'anticipated loss of earnings' includes speculation" and denying to calculate lost wages on a planned business venture); *Dillenbeck v. Sec'y of Health & Hum. Servs.*, 147 Fed. Cl. 131, 139 (2020) (citing *J.T.*, 2015 WL 5954352, at *7). Accordingly, it is not enough to substantiate such a request with some

---

[7] Statistical data for all GBS cases resolved in SPU by proffered amounts from SPU's inception through July 1, 2023, reveals $167,600.00 as the median sum awarded for *all* damages in such cases. The awards in these cases—totaling 307, have typically ranged from $127,346.66 to $254,153.78, representing cases between the first and third quartiles and awards comprised of all categories of compensation—including lost wages. 39 cases include the creation of an annuity to provide for future expenses.

Past pain and suffering amounts awarded in substantive decisions issued in 28 SPU GBS cases range from $125,000.00 to $192,500.00, with an additional case involving annuity payments. The median amount award in these 29 cases was $171,248.72. Awards in cases falling with the first and third quartiles range from $158,027.98 to $180,000.00.

evidence, if the submissions offered ultimately rely on speculated (if somewhat informed) "guesses" about what a claimant might have earned under optimal conditions. *See, e.g.*, *Moreland v. Sec'y of Health & Hum. Servs.,* No. 18-1319V, 2022 WL 10469047 (Fed. Cl. Spec. Mstr. Sept. 2, 2022) (denying injured real estate agent's claim of lost commissions; although petitioner substantiated her claim with evidence, she could not demonstrate her expectation of commissions or other real estate-related income was more than a reasoned hope).

## ANALYSIS

The record preponderantly establishes that Petitioner was appropriately diagnosed with GBS *on top of* a preexisting chronic diabetic neuropathy. *See* ECF No. 66. None of Petitioner's treating providers, including his numerous treating neurologists, disagree with this joint diagnosis—or questioned whether Petitioner had diabetic neuropathy at the time of his GBS onset. *See generally* Ex. 4 (M-MMC December 2016 admission records). And Respondent has of course *conceded* entitlement, based on the conclusion that the Table elements of a flu vaccine-GBS claim were met. Thus, *some* amount of damages are appropriately awarded in this case.

However, even though Petitioner is now entitled to a damages award, the Act only permits him to recover *reasonable* damages associated with his injury. 42 U.S.C.A. § 300aa-15(1)(A). And the parties strongly disagree about the extent to which Petitioner's damages are *primarily* attributable to the vaccine injury, as opposed to his proven preexisting condition. It thus remains disputed whether the totals requested are reasonable—and also the extent to which certain kinds of damages are warranted, given the dual nature of Petitioner's injury.

## I.    Pain and Suffering

Neither party disputes Mr. Alonzo's awareness of his injury, leaving only the question of the duration and severity of the injury. To evaluate that issue, I review the record as a whole, including the medical records and affidavits filed, and all assertions made by the parties in written documents.

Here, the record establishes a relatively moderate GBS injury and treatment course. Petitioner's GBS onset occurred within two to three weeks of vaccination, in mid-December 2016. After hospitalization, he was discharged to an in-patient rehabilitation facility, remaining there for some time, although the record suggests the months-long period he spent there was more attributable to personal issues independent of his GBS. Indeed, he showed significant improvement by April 2017. Ex 4 at 77. After the fall of 2017, the record does not corroborate significant GBS sequelae, or notable secondary symptoms attributable to it that are different from what other, similarly-situated Program claimants have experienced.

I do not find that the *Hood* decision provides a particularly good comparable. That claimant's GBS was treated for nearly a year, with greater amounts of necessary rehabilitation, and he continued to experience significant sequelae in the *absence* of a demonstrated comorbid condition like neuropathy attributable to diabetes. *Hood*, 2021 WL 5755324, at *3–4. Here, Mr. Alonzo's direct care lasted no more than four to five months, and as discussed above what occurred after seems more likely attributable to his diabetic neuropathy. This case is not so severe than an award around or exceeding $200,000.00 is justified.

Nevertheless, as noted above, the nature of GBS *itself* is alarming and concerning enough to make appropriate somewhat larger pain and suffering awards than would be allowed in the context of other vaccine-related injuries. *Hernandez v. Sec'y of Health & Hum. Servs.*, No. 21-1572, 2023 WL 3317354, at *5 (Fed. Cl. Spec. Mstr. 2023) (*citing Gross*, 2021 WL 2666685, at *5). And I give weight to the fact that Petitioner's existing and undeniable comorbidities have increased his suffering in also having to bear the GBS treatment and its impact (even though I also find that sequelae specific to that different condition cannot be reimbursed in this case, and ultimately explains Petitioner's post-GBS suffering).

It is thus appropriate to award Petitioner a sum comparable to the magnitude typically received by other Program petitioners who have experienced flu vaccine-caused GBS, required hospitalization and some rehabilitation, but otherwise did not experience demonstrated significant sequelae beyond what GBS patients commonly see. Respondent's proposed award is clearly in that "ballpark," despite his otherwise-vociferous objections to Petitioner's demand. Accordingly, I shall award **$170,000.00** for actual pain and suffering. This sum slightly exceeds what Respondent proposes, but otherwise reasonably fits within the range of awards that comparable petitioners have received, as illustrated by the case law cited to in Respondent's brief as well as other decisions. *See, e.g.*, *Schenck v. Sec'y of Health & Hum. Servs.*, No. 21-1768V, 2023 WL 2534594 (Fed. Cl. Spec. Mstr. Mar. 16, 2023) ($150,000.00 awarded for mild case of GBS mostly resolving within two months); *Merchant v. Sec'y of Health & Hum. Servs.*, No. 20-450V, 2022 WL 17819548 (Fed. Cl. Spec. Mstr. Nov. 7, 2022) (awarding $170,000.00 in actual pain and suffering to petitioner who was hospitalized over the Thanksgiving holiday for less than a month, but who subsequently required several months of physical therapy; citing decisions in which comparable petitioners received $160,000.00 to $165,000.00). It is a sum of sufficient magnitude to address and acknowledge Petitioner's suffering in experiencing GBS due to a vaccination.

However, I will not award any future pain and suffering component. Petitioner simply has not shown on the basis of this record that his ongoing sequelae are the product of GBS, rather than attributable to his type II diabetes-related neuropathy. Contemporaneous treaters have consistently acknowledged his preexisting neuropathy, and (since the fall of 2017) have focused to an almost exclusive extent on its treatment rather than on addressing what could reflect GBS sequelae. Many

of his specific treatment requirements, such as kidney issues or his diabetic retinopathy, could not credibly be deemed GBS-associated. Moreover, GBS is *understood* to be acute and monophasic; while some cases (*see, e.g.*, *Barone*, 2016 WL 4295004) can present ongoing debilitating sequelae, GBS's course is not progressive or chronic, and therefore any notable sequelae that persist would be observed close in time to onset—not months or years after. Tellingly, Petitioner did not even see (or was directed to see) a neurologist before Dr. Willer, whose involvement was a direct product of the damages dispute in this case—further underscoring the fact that his post-immediate GBS treatment had far less to do with it than with other matters.

As a result, any pain and suffering Petitioner experiences going forward is far more likely to be attributable to his preexisting health issues than to his vaccine injury—the results of which largely appear to have been successfully treated. Although I acknowledge he may be experiencing *some* mild sequela common in GBS, this is taken into account in the actual pain and suffering award sum, which is significant. He has not otherwise established, however, that his suffering from the GBS injury *itself* has either resulted in permanent sequelae or is truly likely to require additional *specific* treatment in the future years. Only where this has been demonstrated have I awarded a future component in flu-GBS cases. *See, e.g.*, *Elenteny v. Sec'y of Health & Hum. Servs.*, No. 19-1972V, 2023 WL 2447498, at *5–6 (Fed. Cl. Spec. Mstr. Mar. 10, 2023) (denying future pain and suffering award; petitioner only established the common kinds of minor lingering sequela common to most GBS patients, as opposed to demonstrating a specific, permanent and substantial deficiency or impact). Notably, Petitioner's injury occurred in the fall of 2016—and thus my determination is based on almost *seven* years of additional medical record evidence. It is not likely that an individual with GBS would have an unexpected rush or new, acute symptoms five-plus years later (and the fact that they were observed in an exam performed in connection with litigation undermines the credibility of such exam findings even more so).

I make this determination despite Petitioner's expert offerings from Dr. Willer—for they do not persuasively establish that Petitioner is suffering from substantial GBS-related sequelae that merit specific future care or concerns. Dr. Willer stubbornly avoided reckoning with Petitioner's amply-documented pre-vaccination history of uncontrolled diabetes and related complications—and then similarly ignored evidence from the time of the GBS diagnosis onward that Petitioner's suffering was not attributable to his GBS. *Compare* Willer Exam at 1 (reporting that before vaccination, Petitioner "did not experience weakness, pain, numbness, or tingling in his arms or legs. He was compliant with diabetes medication with fasting blood sugars in the 100s") *with* Opp. at 2-& (describing numerous instances in the pre-vaccination record in which Petitioner's diabetes-related measurements were significantly elevated, and many examples of neuropathic symptoms). He otherwise ineffectually and unpersuasively argued with the medical record, attempting to pick out points in support of his view while simply gainsaying items that directly contradict his narrative. He was wholly unpersuasive in his denial-based approach. By contrast, Dr. Cohen has

concisely established that Petitioner's pre-existing diabetic neuropathy explains almost all of his post-vaccine complications. And that opinion is supported by the weight of the medical record.

There are several examples from the record of how Petitioner unsuccessfully attempted to show the existence of an ongoing, persistent GBS-related symptom. For example, Petitioner stresses ongoing ataxia or an uneven gait as a debilitating symptom attributable to his GBS. *See, e.g.*, Br. at 12, 18. He further contends that the instances of ataxia noted by Dr. Cohen pre-vaccination are not reliable, or are erroneous. *Id.* at 27. But ultimately what matters, for purposes of determining the propriety of a future pain and suffering component, is whether these gait issues (which I do find were present *at the time* of Petitioner's GBS manifestation in December 2016) persisted or became a chronic, GBS-associated symptoms—and the evidence preponderates strongly *against* that determination. *See* Opp. at 10, 12, 15–20.

Dr. Willer's conclusory determinations that these findings are "impossible," merely because Petitioner did reveal them close-in-time to when his GBS occurred) are wholly unpersuasive. Again—GBS is an *acute* and *monophasic* condition—and in most instances it will not result in long-term sequelae, even if some sensory or other deficits linger. But the lasting impact of those sequelae can be taken into account in terms of the magnitude of the *actual* pain and suffering award, as I have done here. This simply is not a case in which the claimant has established a true, ongoing deficit of sufficient degree to justify a future component. Rather, the persistent "story" the record tells is that Petitioner's post-GBS health issues are a direct product of his uncontrolled diabetes.

In the end, I found Dr. Cohen's succinct opinion, which relied on a comprehensive and accurate reading of the medical records in their totality, substantially more credible than what Dr. Willer has offered. In so doing, I am not "hiding" my finding within a credibility determination. Rather, I am performing my duty as special master, which includes consideration of whether a particular expert opinion is persuasive or not in light of the overall record. I am not compelled to accept an opinion that appears poorly-supported by the evidence. *Sword v. United States*, 44 Fed. Cl. 183, 188 (1999) ("[n]o judge or jury can be forced to accept or reject an expert's opinion or a party's theory at face value. To require such a choice in this context is to neglect the Special Master's duty to "vigorously and diligently investigate the factual elements" underlying the petition"). Having performed that analysis, I conclude that Dr. Willer's opinion is *not persuasive*.

## II.      Lost Wages

The paucity of Petitioner's lost wages showing generally is facially self-evident. All Petitioner has offered to establish damages from his lost earnings consists of two witness statements, without *any* of the kind of corroborative documentation—pay stubs; tax returns; indirect evidence of employment as a barber (for example, email or other correspondence with

employers)—that would make it possible for me to find that *any* monthly sum, let alone the $12,500.00 monthly income figure claimed, reflects a fair determination. Thus, and despite the fact that the record *alludes* to Petitioner's work as a barber, I cannot award any past lost earnings.

The same is true for Petitioner's future lost earnings demand. This component of damages is even *less* substantiated, as Petitioner relies solely on an unsworn witness statement about a possible job opportunity to corroborate his contention that he could not work in the future. Given that his GBS treatment ended more than six years ago, I cannot base a future lost earnings award on the fact that he continues to obtain treatment—especially when ongoing treatment seems almost wholly a function of his existing diabetic neuropathy. He has not otherwise shown a likely business concern that he has foregone due to his GBS—or, more foundationally, that he cannot find work *comparable* in pay or personal satisfaction to what he performed before (a matter that is not itself substantiated). Thus, it is wholly speculative that Petitioner could have expected to receive in excess of $10,000 a month in compensation for the remainder of his adult working life—and therefore no future lost earnings shall be awarded.

In denying entirely this aspect of Petitioner's damages demand, it should be noted that *Petitioner has had ample opportunity to substantiate damages in this case.* A damages order was issued in this case over three years ago, while the matter was still in SPU, placing Petitioner on notice that he would need to offer proof to show the basis for the elements of his demand. Damages Order at 1. The matter left SPU in October 2021, over a year later—without this issue corroborated any better. Then, I issued an Order (after the case had been reassigned to my regular docket) in May 2022 warning Petitioner that I would only provide him an additional *six months* to substantiate his damages demand, with the record closing by that summer. Order, dated May 2, 2022 (ECF No. 91).

After all that, Petitioner has only been able to provide the three referenced witness statements. It is clear that he has been given more than enough time to prove damages—and that fourth, fifth, or sixth chances are not appropriate (and not at all in keeping with the Program's policy goal of swift determinations based on reduced adversarial proceedings). While in other cases it might be appropriate to permit a claimant "one last chance" to act, the circumstances here do not make that a judicially-acceptable approach.

## III.    Next Steps

Unfortunately, the present determination leaves two critical damages issues unresolved: prior unreimbursed expenses and anticipated future care expenses.

The former should not result in further significant disputation by the parties. Petitioner has stated that he is in the process of calculating the Medicaid lien in this case (which will reflect 100

percent of past unreimbursed expenses—albeit *only* those related to GBS care). Thus, once the number is provided to Respondent and the math confirmed, adoption of this sum in a final damages decision poses no great task (other than agreeing as to what costs are specific to GBS versus those that were not).

Petitioner also seeks an award of future care, based on determinations by his life care planner. But (like all other damages components in this case), the parties have hotly disputed the sums at issue, with Respondent offering a life care planner opinion of his own, and which takes issue with *any* such award at all. In order to resolve future care needs, I am prepared to hear testimony from both life care planners.[8] (I do not, however, require live testimony from the treatment experts who offered the opinions discussed herein). Such testimony (and in fact the life care plan itself) must take into account, however, the fact findings in this Ruling: that many of Petitioner's post-vaccination symptoms are not associated with his GBS, and thus he is not entitled to future care costs that are not GBS-related.

Because of my determination, many of the requested care costs are likely to be rejected. Moreover, Petitioner has not also taken into account insurance or Medicare/Medicaid offsets for future treatment. Accordingly, any testimony or amended life care plan input offered in this matter at a date to be determined must not only perform the missing offsets, but must be based on the fact determinations *herein*—not the rejected opinion of Dr. Willer. Petitioner may of course attempt to demonstrate that certain life care plan items *are* reflective of the need for GBS-associated care (assuming existing insurance or government programs will not cover the costs), but must do so based on record evidence rather than Dr. Willer's unconvincing assessment.[9]

---

[8] This case will under no circumstances be permitted to languish another year. Rather, the parties should anticipate a hearing date to be scheduled within *six months* of this ruling, or before April 2024.

[9] I urge Petitioner in particular to greatly edit his existing life care plan (or even consider abandonment of it entirely). It is my experience that only in the most extreme GBS cases, where care is explicitly aimed at treating demonstrated GBS sequelae, and where a claimant is so disabled as to virtually be unable to care for themselves, is future care a reasonable consideration. *See, e.g.*, *Barone*, 2016 WL 4295004 (awarding $661,082.54 in lump sum for prior expenses, pain and suffering, and some home attendant care; injured party suffered from quadriparesis (muscle weakness in all limbs) and had to be cared for at skilled nursing facility). I do not award future care simply because a GBS patient has some lingering vestiges of the condition—and Petitioner risks a disallowance of costs associated with litigating this matter further if the issue is unnecessarily maintained despite my reasoned and substantiated concerns about its viability.

## CONCLUSION

Based on the foregoing, and in the exercise of the discretion afforded to me in determining the propriety of a final fees award, Petitioner is determined to be entitled to $170,000.00 in actual pain and suffering, but no lost earnings past or future. This sum will be included in the final damages decision in this case, which will be issued after (a) the amount of the Medicaid lien is determined, and (b) a means for resolving future care is proposed and adopted.

The parties shall contact chambers immediately to set a status conference to discuss how all remaining damages components can be resolved.

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master